## PENNINGTON ENGINEERING CO. v. HOUDE ENGINEERING CORPORATION.

### No. 2280.

District Court, W. D. New York.

Jan. 21, 1941.

On Rehearing Dec. 16, 1941.

700

Luther Day, Leslie Nichols, and Ray S. Gehr, all of Cleveland, Ohio, and Max D. Farmer, of Buffalo, N. Y., for plaintiff.

Carlton Hill and Charles W. Hills, Jr., both of Chicago, Ill., and Harold I. Popp, of Buffalo, N. Y., for defendant.

KNIGHT, District Judge.

The complaint alleges two causes of action: one based on breach of confidence in that the defendant manufactured shock absorbers embodying plaintiff's invention after the confidential disclosure of such invention to the defendant; the other for patent infringement. Since liability on the first cause of action depends upon liability upon the second, the question of infringement will be first considered.

The complaint alleges infringement of Claims 18, 27, 28 and 37 of Patent No. 2,009,677, original application filed November 19, 1928, and issued to the plaintiff on July 30, 1935. On the trial plaintiff conceded non-validity of Claim 18.

It is not necessary to detail the functions performed by the automobile shock absorber. Suffice it to say it is to limit and retard the re-bound movement of the springs when road obstacles are encountered.

Each of the devices in suit is what is known as a hydraulic vane type of automobile shock absorber. Such type has been in use for many years. One Maurice Houdaille pioneered in the development of its basic features. Patents thereon were first issued to him upwards of thirty years ago, and since then numerous patents directed to the development of the hydraulic shock absorbers have been issued to him or to his associates or successors in interest. The defendant corporation takes the word "Houde" as an abbreviation of the name "Houdaille". The plaintiff's device has never been placed upon the market for sale. A considerable number have been manufactured for demonstration purposes. The defendant corporation, as the manufacturer of shock absorbers, is widely known and has made and sold shock absorbers up into the millions.

The unassembled parts in Pennington and one of the three stipulated defendant's structures, Exhibit A, are shown in the following diagram: (The differences in these structures are not material here.)

The parts in assembly in Pennington and defendant's accused structure, stipulated Exhibit "A", are here shown:

outer edge of the vane move closely in the sides and peripheral wall of the sector. Means are provided for the recovery of

G. R. PENNINGTON

2,009,677

FIG.1

FIG.2.

SECTION THRU
HOUDE SHOCK ABSORBER A-2376
THIS VIEW TAKEN ON LINE 2-2

FIG.3

FIG.I.

FRONT VIEW OF
HOUDE SHOCK ABSORBER A-2376
SHOWING OUTER CASING REMOVED
AND COVER PARTLY BROKEN AWAY

FIG.6

FIG.3.
ENLARGED
SECTION 3-3

The essential mechanical elements of the Pennington invention in combination are these: a casing structure comprising a working chamber having three main parts, a rear wall member, front wall member, and intermediate member, the three secured together in fixed relation to each other by dowel bolts and cap screws, a shaft with a swing piston integral with a vane extending radially therefrom, with bearing support on the front and rear wall members, the three members, when secured together in conjunction with the hub of the piston, providing a sector-shaped chamber in which the vane swings radially. The hub and vane are of the same width axially and the sides and the

any leakage from the working chamber through the joints and its return through a replenishment passage in the front member to the chamber. This single vane construction is of the eccentric type.

The accused structures each embody a cylindrical cup-shaped outer casing forming the end and side walls of a working chamber and an end wall held in engagement with the cylindrical cup member; a so-called ring wing with two abutments integral therewith, which is inserted tightly in the cup-shaped member; a shaft held in bearings in the cup-shaped member on the end walls with a screw piston integral with two vanes extending radially therefrom. The hub and vanes are axially of

the same width and the vanes move angularly in the sectors formed in the cup-shaped member, with the sides and edges of the vane in close proximity with the interior of the side members and peripheral wall of the ring wing. These assemblies also show means for the recovery of leakage.

■ Disregarding the question of any automatic replenishment of the working liquid and freedom from leakage, the only question of structural difference is with regard to the type of the abutments. In view of the fact that Claim 18 has been withdrawn as an issue, it is necessary only to consider the method of replenishment of the working chamber functioning as a part of the combination of plaintiff's structure. There is insufficient change in this replenishment method over the type of Houdaille utilized before Pennington to attribute invention to this alone.

This type obviously is the dual vane concentric type.

The accused structure hereinbefore shown and the second and third accused structure function essentially in the same manner and each discloses the so-called ring wing with integral abutments.

Stipulated Exhibit B (an accused structure) has a deeper forward extending flange than stipulated Exhibit A thereby permitting the flange to co-operate with a different form of replenishment chamber integrally attached to the bearing boss of the front plate member, and it also differs in respect to the replenishment passage. Stipulated Exhibit C (also an accused structure) does not show the deeper forward extending flange of Exhibit B. It differs from Exhibits A and B with respect to the method of the engagement of the front plate or cover member with the cup-shaped member. Like Exhibit B the replenishment chamber is formed integrally with the front wall member and differs in some respects from A and B with respect to taking care of the leakage. Since the replenishment feature of the chamber's construction, the subject matter of Claim 18, is not now in suit, it is unnecessary to consider this in connection with the charge of patent infringement.

■ The question of infringement here depends upon (1) whether the claims in suit are limited to a single vane type of shock absorber construction, (2) if not, whether the claims in suit as combinations including a three-part working chamber, showing abutments integral with the intermediate part, are broad enough to cover the structures of the defendant showing abutments integral with the ring-wing as heretofore shown, and (3) whether the claims when considered as combinations constitute invention. The single vane type of construction has long been known. The functions and advantages in absorbing the shock are not essentially dependent upon single vane form of construction or eccentric arrangement of the shaft. Neither the eccentric arrangement nor the concentric form is essentially related to the constructural combination of the claims in suit nor the function and advantage of those combinations. The Pennington Patent Office record discloses that the examiner in rejecting certain claims to a combination constituting a single vane type did not read into the language of these claims any limitation to a single vane construction. This is made evident by the fact that these claims were rejected as met by the patent to Houdaille (No. 1,087,017) which showed the double vane type of construction. Later in the Patent Office the patent to Schultz et al. (No. 1,627,810) showing a double vane construction was cited against certain claims in plaintiff's application. It appears the Patent Office did not consider the claims in suit as limited to the single vane type. So far as the essential functions involved in the claims in suit are concerned, the dual vane type is a simple duplication of the single vane type. It is also noteworthy that Peo re-issue Patent No. 19,631 shows a single vane type as well as a double vane. It is thought that the disclosures in the patent are sufficient to include the double vane construction. Admittedly the Pennington chamber is adaptable to double type construction. The patentee states, p. 14, line 44 et seq. of the patent: "It will be understood that the invention is not limited to the particular forms of construction which have been shown and described for purposes of explanation and illustration but that the construction shown can be varied widely within the scope of the appended claims."

Until 1931 Houde never showed a three-part structure with abutments integral with the peripheral wall of the chamber or with a ring inserted in the peripheral wall. In the Houdaille Patent No. 933,076, issued September 7, 1909, the abutments of the shock absorbers were secured separately to the peripheral wall of the chamber by screws. In the Houdaille Patent No. 1,087,017, issued February

10, 1914, the abutments were engaged in slots or grooves set in the peripheral wall. This latter was the basis for the structure Houde manufactured and sold from 1922 to 1928. In the last-mentioned structure the two abutments were tied together to form a single unit with a flat ring portion fitting over a central bearing boss which projected from the flat surface of the rear wall of the chamber and the abutment ends engaged in grooves in the peripheral wall. In 1928 defendant adopted another method of securing the abutment ends in the peripheral wall and that was by undercutting the peripheral wall adjacent to the rear wall when the slots or grooves were to be formed to provide overtravel of the cutter which formed the grooves and avoid the later scraping movement theretofore required. This method of undercutting peripheral walls made calking between the joints necessary. In a later patent to Houdaille No. 1,843,603, it was sought to obviate the necessity of such calking, but so far as appears no structure under this patent went into commercial use.

The last-described abutment structure was in use by the defendant corporation in January, 1931, when Pennington disclosed its structure to officers of the defendant corporation. In May, 1931, the defendant through Mr. Peo, an officer of the defendant, applied for patent No. 1,-920,273. This disclosed substantially the construction shown in the accused structure Exhibit C. The drawings of the original application showed the accused type of construction, but no claims were then made to this subject matter. The patent issued on August 1, 1933, but it was not until September 7, 1934, that the application for re-issue was made. In the re-issue patent the defendant secured three additional claims which cover its specific form of a three-part working chamber construction. The re-issue Patent is dated July 2, 1935.

Successive patents to Houde demonstrate the groping to find better method of forming its vane abutments. The necessity for this is found in the characteristics which the plaintiff claims flow from the Pennington type of shock absorbers. These are a permanently rigid and accurate working chamber, an automatic replenishment of the liquid, and freedom from leakage, and adaptation to low cost quantity production. Of necessity the hydraulic type of shock absorber is subject to great pressure. It is apparent that an abutment integral with the middle member or integral with the ring-wing makes for greater rigidity and the making of a more accurate working chamber. In normal operation this runs as high as 2,000 to 3,000 pounds per square inch. Accurate formation of the inner surface of the working chamber and accurate machining of the re-entrant corners to the flat and cylindrical surface in order to conform to the corners on the outer edges of the vane are better insured in the three-part construction such as Pennington or such as that of the defendant with its ring-wing. Of course, the less distortion in the working chamber and parts therein and the greater the accuracy of the formation of the inner surfaces of the working chamber, the less the leakage. The plaintiff's and the accused structures are better adapted to low cost production than the earlier structures, by virtue of one fact, if no other, and that is the simplicity of construction of the Pennington type of abutment as against such utilized by the defendant prior to 1931. The claim of the patent to Pennington when considered in the combination described shows invention.

The contention that the ring-wing is a mere abutment positioning member and not part of the working walls can not be sustained. Defendant's Peo re-issue Patent No. 19,631 in claim 4 characterizes it as an "integral structure" and "said structure and end walls forming a hydraulic working chamber." It clearly adds rigidity to the structure. The liner constitutes the third part of the construction comparable with the intermediate member of Pennington. It is a wall member in the sense of Pennington's intermediate member. Nor is anything seen in the contention that the Pennington structure is not suited to mass production because the parts are not interchangeable. Nor is persuasive reason shown why they are not interchangeable in assembly.

■ Is plaintiff's combination invention? It is believed it is. While it is my view that the essential difference in Pennington and prior Houde structures is found in the abutment formations, it is the new abutment integral with the peripheral wall in combination with old elements which constitutes invention. Nor as I see it are the claims themselves broader than the invention. After the accomplished fact it would seem that one skilled in the art long

since would have produced shock absorbers with abutments in the chamber integral with the side walls, but, if Houdaille with all his experience and the Houde corporation with all its facilities were unable to find an answer to this problem, it seems to me we must conclude that this type of formation of abutment in combination in a three-part structure as shown by claims in suit was invention. True it is that the parts had long been known in the art. True it is that these earlier structures were workable and were sold to the number of millions. The substitution of the integral abutment in combination with the other elements of the claims in suit, however, meant greater certainty of the necessary rigidity of the structure, better opportunity for accurate machining of the parts; better sustaining of the pressure and lessening of production costs. A long-recognized need was satisfied. Performance in a way known to the art does not deny the invention. Here we find the substitution of a new part with the old and thereby accomplishing new useful and valuable results.

Houde used the ring-wing type from 1931 to 1938. In 1935 the Pennington patent issued. In 1938 Houde came out with a distinctly different type which has been its main production since that date. In this 1938 type of construction the abutments are cast integral with the face member of a two part chamber construction. The face member is generally in the form of the face member in accused structure Exhibit B, save that the abutments are integral therewith in this new type. It is believed that Pennington showed meritorious improvement over the old device.

On the question of non-infringement of Claim 37, attention is called to various items said not to be shown in the accused structure "A". These are the piston element, or the piston and eccentric element mounting, the flat surface engagement of the rear and intermediate walls, the flat surface engagement of the rear and intermediate members, the intermediate member, the nut and dowel pins holding the parts in a fixed relation and leakage through the bearings. It seems to me that all of these elements find response in Exhibit A and that all of these parts of Pennington co-operate in substantially the same way to perform the same functions. What has been said with reference to accused structure A is applicable to accused structures B and C.

As to Claim 27 it is defendant's contention that accused structure A does not respond to certain clauses therein because it has "no inner casing." The working chamber in each is the "inner casing." In accused structure A it is formed by the peripheral surface of the ring-wing, and the walls of the rear and front members. The working chamber casing of each is composed of a three-piece box. As heretofore said, in the view here taken, the ring-wing forms "an inner casing member" and responds to the claim in this connection. The clauses of the claim referring to a piston shaft of the single vane type do, as I believe, respond to a double vane shaft of accused structure A. It is assumed that the same questions are raised with respect to accused structures B and C as regards Claim 27 as are raised with reference to accused structure A. We see no material difference in defendant's position as to Claim 28 from that taken as to Claim 27. As to each, the various elements of these claims to which attention has been directed co-operate in substantially the same way to perform the same functions as in Pennington.

Numerous patents are set up as anticipating Pennington. Reliance in this respect is placed principally upon the Thayer Patent No. 1,883,436; Johnson Patent No. 1,578,319; and Taylor Patent No. 1,438,507.

It is undisputed that the wall member and the abutment in Thayer, supra, are not integral. Thayer claims nothing for rigidity and accuracy from the abutment structure. The materiality of such distinction is pointed out in the application for Peo re-issue Patent No. 19,631 in distinguishing it from the Thayer Patent. Further, Thayer recognized the insufficiency of this type in his Patent No. 1,936,695. Thayer, supra, was not cited in the Patent Office. A sufficient reason for this is that it meets none of the claims in suit.

In the Johnson Patent the abutment is, like Thayer, mechanically secured to the walls of the working chamber. Johnson also differs from Pennington in that the tubular part of the peripheral wall of the working chamber does not extend clear around and the abutment member fits in between the ends of the tubular part. The abutment is not integral with the working chamber wall. Certainly, as shown heretofore, neither of the claims in suit find

complete response in Johnson or Thayer as does Houde. Each of these patents shows a three-part casing.

Taylor Patent No. 1,439,507 also shows a three-piece casing assembled comparably as is Pennington—flat surfaces engagement with the intermediate member. Taylor, however, shows no movable vane and hence no abutting wall or abutments in the peripheral wall. What may appear comparable with an abutment integral with the peripheral wall is described as a "fixed partition." One end of this is integral with the peripheral wall and the other keyed on the stud on which the entire structure moves or oscillates. It extends clear across the hollow part of the device. It rotates with the movement of the device. Further, it is conceded that Taylor is inoperative as mounted in its present form. The most that seems to have been claimed for it on the trial was that the problem of Pennington as to the three-part casing was answered by Taylor. Sufficient reason is shown why none of the three patents just mentioned were cited before the Examiner. It is further to be noted that on the Peo application for reissue the applicant urged that Thayer was not relevant.

It does not seem to me necessary to call attention to any of the other of the defendant's prior art patents. The ones stressed by the defendant have been heretofore described, and it seems clear to me that nothing anticipatory is seen in the others. For the reasons that I have given, I find that Pennington invention was not anticipated by anything in the prior art.

There is some testimony that in 1927 defendant was considering some ring-wing method of securing the abutments. There is, however, no evidence of any construction or currently made drawings or descriptions. The defendant also introduced a drawing dated May 1, 1930, purporting to show a liner or ring-wing made out of bakelite. There is some confusion as to whether this later drawing shows the ring-wing with abutments integrally attached. This specially is so in view of Fox Patent No. 1,909,943, applied for January 31, 1931, owned by the defendant, which shows a bakelite formation lining the entire cup-shaped member. It is not necessary to determine this question in so far as it bears upon question of anticipation, because it is dated later than the filing date of the Pennington application. Defendant also introduced a drawing dated

November 21, 1930, also since Pennington's application file, purporting to show a soft metal die cast ring-wing with abutments integrally attached. Admittedly this type of metal construction was a failure because of the electrolitic action set up between dissimilar metals of the assembly structure. Another drawing dated April 30, 1931, shows a malleable iron ring-wing with integral abutments comparable with the ring-wing shown in the accused structures. This drawing date was subsequent to the meeting in Cleveland. The testimony in connection with these various drawings and the alleged efforts of the defendant to construct a device with abutments integral with the casing structure are insufficient to establish anticipation. In the defendant's main brief no point is made of the alleged independent development efforts as made by the defendant as hereinbefore described, but in defendant's appendix to that brief reference is made to the drawing dated May 1, 1930, showing a bakelite ring-wing liner, and that alone.

The defendant urges laches as a defense. This is set up in an "appendix" to its main brief. It was not pleaded. It is quite true that "Neglect for an unreasonable and unexplained length of time, under circumstances permitting diligence, to do what in law should have been done, is laches," Haynes & Co. v. Druggists' Circular, 2 Cir., 32 F.2d 215, 216, and long lapse of time has been held sufficient of itself to prevent relief. Gale v. Southern Bldg. & Loan Ass'n, C.C., 117 F. 732; appeal dismissed, 4 Cir., 130 F. 1021; Haynes & Co. v. Druggists' Circular, supra.

The issue ordinarily must be raised by answer or by motion. This being an action in equity, the facts established in a particular case may show such long delay in bringing suit that plaintiff must give sufficient reason for the delay or be estopped. Nagy v. L. Mundet & Son, D.C., 23 F.Supp. 543, 38 U.S.P.Q. 55; Id., 2 Cir., 101 F.2d 82; Marconi Wireless Tel. Co. v. New England Navigation Co., C.C., 191 F. 194; Richards v. Mackall, 124 U.S. 183, 8 S.Ct. 437, 31 L.Ed. 396.

Where it appears on the face of the complaint there has been long delay in the commencement of suit, it may not be necessary to plead laches, but if not pleaded a motion to dismiss should be made. In the instant case no motion was made. No question in this respect was raised upon the trial, and I do not think it can be

raised now. Further, the undisputed evidence is that the accused structures have been manufactured and sold by the defendant to some extent from 1931 to the time of the trial. There was a continuing liability, and under such a state of facts the plaintiff is not guilty of laches. Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60; 21 C.J. §§ 229, 230.

It is admitted that through arrangements brought about by a representative of the plaintiff, a meeting between representatives of the plaintiff and the defendant was held at the office of the plaintiff on January 19, 1931, in Cleveland. It is undisputed that this meeting was held for the purpose of interesting the defendant in the purchase of the patent now in suit, or acquiring some interest therein. It is undisputed that a disclosure of the invention was then made to the representatives of the defendant. It is unnecessary to detail the transactions that then took place. Plaintiff also claims that its invention was disclosed to representatives of the defendant on October 15, 1930. This, however, is denied. It seems unnecessary to pass on this disputed claim. The undisputed evidence is that the plaintiff prior to this meeting had disclosed this invention to numerous other corporations, either the manufacturers of automobiles or parts therefor. The evidence is that disclosures to these various companies were for the like purpose as that to the defendant. All these disclosures were made subsequent to the filing of the plaintiff's application and prior to the issuance of the patent in suit. It is the contention of the defendant first that there can be no recovery for any appropriation of the invention prior to the issuance of the patent and, second, that the acts of the plaintiff in revealing its patent to these various companies constitutes abandonment or dedication to the public.

 It does not seem to me that either of these contentions can be sustained. An inventor does not abandon or dedicate his invention to the public by disclosing it to different individuals with the sole purpose to interest them in the production or manufacture of an invention. Whether such acts amount to abandonment depends upon the intention of the inventor and the manner in which the disclosures were made. Abandonment is a question of intent. International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293. The purpose of disclosure, as here, that

is, for the procurement of the production of the invention, of itself, is an act of denial of the intention to abandon. The publication so made was a limited publication and no rights inconsistent with or adverse to such restriction are secured. Werckmeister v. American Lithographic Co., 2 Cir., 134 F. 321, 68 L.R.A. 591; American Tobacco Co. v. Werckmeister, 207 U.S. 284, 28 S.Ct. 72, 52 L.Ed. 208, 12 Ann.Cas. 595; International News Service v. Associated Press, supra.

 Unless the inventor has abandoned his application, he has a property right which the courts will protect pending the granting of a patent. Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 1936, 80 F. 2d 912; Booth v. Stutz Motor Car Co., 7 Cir., 56 F.2d 962; New Era Electric Range Co. v. Serrell, 1929, 252 N.Y. 107, 169 N.E. 105. As was said in Hoeltke v. C. M. Kemp Mfg. Co., supra [80 F.2d 923]: "Where, in advance of the granting of a patent, an invention is disclosed to one who, in breach of the confidence thus reposed, manufactures and sells articles embodying the invention, such person should be held liable for the profits and damages resulting therefrom, * * *." The cause of action for breach of confidence is not based upon the patent law, but upon the ground that the plaintiff has been damaged in its property rights. These property rights are in the invention. As was further said in the case last cited: "It would be a reproach to any system of jurisprudence to permit one who has received a disclosure in confidence to thus appropriate the ideas of another without liability for the wrong." The basis of the right of recovery is definitely stated in Becher v. Contoure Laboratories, 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed. 752, wherein it was held that an undisclosed invention does not need a patent to protect it from disclosure by breach of confidence. As this court said in Gilbert v. General Motors Corp., D.C., 32 F.Supp. 502, 504: "However, where a breach of a trade secret or use of disclosures made under an agreement of secrecy or confidence is properly alleged, a cause of action lies to secure to the wronged party the damages suffered by reason of the abuse of the confidential relation." Numerous cases are therein cited to support the view here taken that the plaintiff is entitled to recover damages from the date of the disclosure of its invention to the defendant.

 The disclosure of the invention to the defendant in confidence implies an

agreement to keep it in confidence. Breach of confidence is evidenced here by the fact that the defendant began the manufacture and sale of its accused structures shortly after disclosures of plaintiff's device to it; that the defendant well knew the value of plaintiff's device, since for years previously it had pursued the effort to accomplish the result attained by abutments integral with the peripheral wall; that the Peo application was filed May 4, 1931, within four months after the disclosure by plaintiff of its device, showing the ring-wing with integral abutments; that no claim to such element was made until the application for re-issue in 1934, and the further fact that the defendant has ceased the manufacture and sale of the ring-wing type, save to a very limited extent.

The plaintiff asks for punitive damages. The question of the right to such damages might properly be presented on the coming in of the report of the master to compute damages sustained. However, it is my view that the evidence does not warrant a finding that the manufacture and use of Pennington combination was with the deliberate intent to damage the plaintiff or to violate its property rights and that no punitive damages should be allowed.

I find and decide:

1. That Pennington Patent No. 2,009,-677 when issued was a valid patent.

2. That such patent has not been abandoned.

3. That such patent is infringed by the defendant's structures Exhibits A, B, and C.

4. That plaintiff sustained damages by reason of such infringement.

5. That plaintiff is not entitled to punitive or treble damages.

### On Rehearing.

A rehearing was granted herein for the reconsideration of the patent to Taylor No. 1,438,507, and the consideration of the patent to Sutton No. 1,341,395, granted May 25, 1920. This was limited to the questions of anticipation and validity.

The plaintiff bases its suit for infringement on these features of its automobile shock absorber: (1) a three-part working casing with abutments integral with the intermediate member; (2) means for holding the three parts together in fixed relation; (3) and an automatic replenishment reservoir. It asserts that the problem in the shock absorber art had been (1) to secure a permanently rigid and accurate recovery chamber, (2) automatic replenishment of the working liquid, (3) freedom from leakage and service attention, and (4) adaption to low cost production; and that the aforesaid features of its device in the combination with the other parts shown solved these problems.

Taylor, like Pennington, is of the single vane or eccentric type and discloses an hydraulic shock absorber with a three-part working chamber casing held together by studs and bolts, rather than by cap screws and dowel pins or dowel bolts, as in Pennington, and abutments integral with the intermediate member. In Taylor the casing receptacle is movable and the vane (partition) immovable, and in Pennington the reverse is the operation, but the relative movements between the casings and vanes, effecting the pressure of the fluid within the chambers, are the same. Taylor does not show any reservoir for the recovery of leakage. Both show equal facilities for broaching the interior of the chambers and machining the re-entrance corners therein, and the interior contours of the working chambers are comparably alike. Concededly the Taylor device is inoperative as an effective shock absorber due to the fact that the link connecting the absorber and frame of the vehicle is pivoted on the absorber. There are other defects.

The Sutton patent discloses an hydraulic shock absorber with three-part working chamber casing in which the intermediate casing is provided with inwardly projecting abutment members integral therewith. It discloses a double action shock absorber of the balanced or concentric type. The abutments divide the two chambers in two parts, and vane and chamber casing function in the manner long known in the art. In Sutton the three parts are neither held together by bolts and screws nor dowel pins or dowel bolts. To secure them the front member may be either screwed in the open end of the cup-shaped member by threads on the inside of the cup, and this method is comparable with the accused structure, stipulated Exhibit C, and is the equivalent of the Houde 1922 structure in that respect, or it may be in the form of a cap provided with an "angular flange" which screws over the end portion of the intermediate member, as shown in the physical exhibit of the Sutton structure in evidence. Sutton does not disclose any method for automatic recovery of the leakage. It shows facilities for

708

broaching or machining equal to those of Pennington. In this structure the casing is stationary and the vane movable.

The drawings below show the casings and vanes of the devices of Pennington, Taylor, Sutton and an accused structure:

The drawings below show the three casing parts and hub and vane of Pennington and Taylor:

by cap screws, and lateral shifting is further prevented by the grooves in the flat surface which receive the ends of the inter-

**Pennington Patent No.
2,009,677
(Fig. 1 with parts
omitted to show
casing structure)**

**Taylor Patent No.
1,438,507
(Fig. 4 with parts
omitted to show
casing structure)**

**Fig. 3
of Pennington Patent**

**Fig. 2
of Taylor Patent**

Neither Taylor nor Sutton anticipates Pennington, since all the elements of Pennington are not found in either "performing substantially the same work in substantially the same way." Walker on Patents, Deller Ed., p. 255.

Johnson Patent No. 1,578,319, a prior art reference on the original trial, discloses a three-part concentrically arranged single vane type of shock absorber. There is no flat lateral surface engagement between the intermediate part and the other two parts, but grooves are provided in the outside parts to receive the end of the intermediate casing part. The parts are held together

mediate part. It shows no dowel pins. It discloses no abutment or abutments integral with the intermediate part. It shows a reservoir for the recovery of leakage through the joints between the casing parts, and communication therefrom through check valves into the working chamber.

Thayer No. 1,883,436, also a prior art reference on the trial, shows a three-part single vane concentric type of absorber with the abutment member secured by means of pins or bolts. The peripheral casing wall of the working chamber is formed in part by a tubular member and the separate abutment. The intermediate part has flat lateral sur-

710

faces engaging the flat surfaces of the other parts. The means employed here for securing the parts together is by threaded engagement of the outer or cover part in an outer casing part. This again in this respect is like Stipulated Exhibit C and also the 1922 structure. It shows a non-pressure reservoir chamber between the "walls" of the working chamber parts and the "shell" or outside casing, comparably like Pennington, with check valve control. It discloses no dowel bolts or dowel pins. Automatic replenishment of the working liquid and freedom from leakage are obtained in Thayer.

Neither Johnson nor Thayer anticipates Pennington. Each lacks the integral abutment feature, and it was this feature which plaintiff has pointed out to show they do not anticipate.

While, as seen, none of the four patents hereinbefore described anticipates Pennington, each is material on the question of the state of the art.

Drawings of Johnson and Thayer follow:

Pennington Patent in suit
No. 2,009,677

Johnson Prior Art Patent
No. 1,578,319, granted Mar. 30, 1926

Pennington Patent in suit
No. 2,009,677

Thayer Prior Art
Patent No. 1,883,436

FIG. 3

FIG 1

FIG. 2

FIG 3

FIG 4

As I said in my opinion heretofore rendered: "It is the new abutment integral with the peripheral wall in combination with old elements which constitutes invention." It was my opinion then that it was the single feature of the abutment assembled in the combination shown in Pennington that made Pennington patentable. In other words, that all other parts of the continuation were either old in the art or in themselves were within the competence of one skilled in the art. As plaintiff states in its main brief with regard to its abutment feature "integrality is of the essence of the combinations." I hold to that opinion now. Taylor was not heretofore given the consideration now given it because it concededly is not effectively operable. Sutton, however, now first presented, is not subject to that criticism.

 It has been clearly shown that abutments integral with the intermediate member in a three-part casing chamber shock absorber were not new with Pennington. None of the three claims in suit contains any language stating the means of securing the three casing chamber members together. The specifications, however, do so, and the drawings show them. Resort

here is not had to the specifications to change or add to the meaning of the claims, as in White v. Dunbar, 119 U.S. 47, 7 S.Ct. 72, 30 L.Ed. 303, and Altoona Publix Theatres, Inc., v. American Tri-Ergon Corp., 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005. Claims are to be construed in the light of the specifications. Glade v. Walgreen Co., 7 Cir., 122 F.2d 306, 311; Aero Spark Plug Co., Inc., v. B. G. Corp., D.C., 40 F. Supp. 386. But the patentee is to be held to the specified means or their equivalents.

The specifications state: "The three parts are tightly and rigidly secured together by cap screws * * * and dowel bolts * * *." These cap screws pass loosely through the front and intermediate part and are screwed into the back plate. Pennington in its preferred form uses four cap screws or what might be termed "cap bolts". These "cap bolts" prevent the pulling apart of the three member casing chamber. The dowel bolts pass through the front and intermediate parts, and, tightly fitting, through the rear part, and serve to secure the casing to the frame of the vehicle and prevent lateral shifting of the casing parts with respect to each other as well as to help to hold the parts together.

The tight fit prevents lateral movement. A "dowel bolt" means nothing more than a pin, normally circular, fitted into corresponding holes in two or more pieces to hold pieces in a fixed position. Their use is common for purposes comparable to Pennington's. The defendant's so-called "ring wing" or intermediate member does have a dowel or machined surface on the outer periphery of that member, in order that it may be accurately and closely fitted in the cup-shaped member. But lateral shifting of the parts is secured by the engagement of the intermediate part in the cup-shaped member. The flange or the wall of the cup of defendant's earlier structure prevented later shifting of the abutment in the same manner. No comparison can be seen between the reamed holes to secure the casing chamber parts together and position them as in Pennington and the accurately machined outer periphery of the intermediate member. It is plaintiff's contention that the ring wing member is the equivalent of the plaintiff's dowel bolts. It seems to me that in the accused structures that is not so.

The accused structures show two pins or dowels fitted into the ring wing. These pins do not extend through the front member of the three part casing. They are loosely fitted and serve the purpose of holding the intermediate member against turning and in approximate angular alignment. They do not hold the three parts in fixed relation.

The defendant does not employ the equivalent of the Pennington "cap screws." In Stipulated Exhibits A and B, the front plate is positioned by the engagement of threads formed on the cup-shaped member with a threaded ring. In Stipulated Exhibit C a threaded front plate engages the flange. The 1922 structure of the defendant has an end wall held in a similar engagement. Further, the use of the cap screws in Pennington, as there used, in view of the studs and bolts shown in Taylor and the bolts shown in Johnson, was merely a development obvious to those skilled in the art. Further, Thayer shows a threaded end plug to hold the parts together in a manner the equivalent of the 1922 structure.

As regards the liquid replenishment feature, Claims 27 and 28 read: "in a shock absorber * * * having an outer casing secured on the inner casing with an intervening reservoir space * * * and covering the joints between the three parts of the casing * * *."

And Claim 37 reads: "means forming a liquid reservoir space disposed to receive liquid leaking outward through the joints between the flat surfaces of the three casing parts."

A reservoir space for the recovery of the leakage was known in the prior art. The replenishment chambers in the accused structures and the 1922 structures are arranged and constructed in substantially the same manner and they function for the same purpose. The equivalent of Pennington in these respects is shown in the patent to Schultz et al. No. 1,627,810. Pennington shows two joints from which there may be leakage. The accused structures show but one. This difference results because the ring wing member of the defendant is forced tightly against the flange and the bottom of the cup-shaped member, while the cover of the Pennington device is loosely fitted over the three parts of the casing. In the accused structure there are no "joints between the three parts of the casing" nor are there "joints between the flat surfaces of the three casing parts." It is true that in the accused structures the rear outer corner of intermediate member is chamferred, two grooves are made across the outer surface of intermediate member and the outer rear corner of the front member is chamferred, and that such construction permits the flow of the liquid between the working chamber and the replenishment chamber, but such a construction does not read on any of the claims in suit. As has been pointed out, Johnson shows a non-pressure casing enveloping the joints between the casing parts, and in the Thayer structure the three-part working chamber is enveloped by a non-pressure replenishing chamber from which liquid is recovered in the joints between the three casing parts. The accused structures show a single joint opening into a non-pressure zone at the end of the cup leading into the inside of the cover.

It is quite clear that the plaintiff did not teach defendant anything in the way of preventing leakage from the absorber itself. The Houde structures prior to Pennington admittedly show that the vane shafts in them were suitably packed to prevent leakage, and substantially the equivalent methods for so preventing it are employed in the accused structures.

As to low cost production it is to be said that the same means to procure it were shown in Taylor and Sutton. As heretofore pointed out, the three structures show equal

or comparable facilities for broaching and machining. Plaintiff lays emphasis upon the statement that the defendant in forming its accused structures uses a method comparable with that employed by the plaintiff. We are not here concerned with a method patent, and equivalency in this regard is material only in so far as it relates to the question of equivalent parts. Again, it is to be said that the methods employed by the plaintiff in broaching and machining parts were employable in Taylor and Sutton, and also in Johnson and Thayer.

The only features shown in Pennington claimed to have been appropriated by the defendant were old in the art or within the inventive skill of one trained in the art. Pennington shows a combination of old parts working the same way to effect the same results as theretofore shown. The prior art leaves nothing of patentable novelty which could have been derived by the defendant from the plaintiff, and the only features of Pennington which can be said to be new, novel and useful are in the specific form of the recovery of liquid through the joints and also in the use of its dowel pins for the particular purpose stated in the patent. Patentability of Pennington depends upon these two features. They are the only ones which we could say "reveal the flash of creative genius not merely the skill of the calling." Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 41, 86 L.Ed. ——, decided November 10, 1941. It follows that if the patent is valid it is not infringed by the defendant and if invalid, obviously the same conclusion must be drawn.

On the rehearing the defendant introduced in evidence numerous patents disclosing various methods of mounting shock absorbers utilized prior to Pennington, particularly to show a change in mounting by which it is claimed the Taylor device could be converted into an operative one. The claims have no reference to the method of mounting, and it does not seem necessary

to me to consider these patents in connection with the issues here. It has been thought that it is not necessary now to further detail and differentiate the inclusions in claims 27, 28 and 38 which are the only claims in question now. So far as is necessary they have been stated.

■ It is clear that the prior art disclosed in the three-part working casing a construction suited for broaching and machining and for low cost production, the equivalent of and equal in these advantages to Pennington. It is also clear that the Houde 1922 shock absorber was a permanently rigid structure in which the working chamber parts and the vane were held in a fixed relation, else the defendant could not have marketed year after year millions of this type of structure. We are considering a greatly crowded art. The Pennington patent is not a basic patent. These considerations require searching inquiry for novelty.

It is possible that the defendant obtained ideas suggesting changes in its shock absorber from the disclosures made by the plaintiff to the defendant in or about April, 1931, and just before the Peo application was filed later in that year. But, if so, such were old in the art and defendant had the lawful right to adopt them in so far as this plaintiff is concerned.

■ Since no infringement is found there can be no recovery on the plaintiff's alleged cause of action for breach of confidence. This is not a case where the patented subject matter did not disclose all of the features of such patent utilized by the defendant. Booth v. Stutz Motor Car Co., 7 Cir., 56 F.2d 962, cited by the plaintiff, is, therefore, not in point.

It is concluded that the defendant does not infringe any of the claims in suit.

The complaint must be dismissed with costs.

Findings are herewith filed and are to be taken as a part of the decision.