PENNINGTON ENGINEERING CO. v.
SPICER MFG. CORPORATION.
No. 10428.

Circuit Court of Appeals, Sixth Circuit.
Dec. 10, 1947.

Ray S. Gehr and Luther Day, both of Cleveland, Ohio (Max D. Farmer, of Buffalo, N. Y., on the brief), for appellant.

Carlton Hill, of Chicago, Ill. (Alexander C. Mabee, of Chicago, Ill., and Donald F. Melhorn, of Toledo, Ohio, on the brief), for appellee.

Before SIMONS, ALLEN, and McALLISTER, Circuit Judges.

ALLEN, Circuit Judge.

This is an appeal from a judgment in favor of the appellee (defendant below) in an action seeking an injunction and accounting. The petition alleges infringement of patent No. 2,009,677, for hydraulic shock absorbers for automobiles, granted July 30, 1935 to appellant (plaintiff below) as assignee of Gordon R. Pennington, and prays for accounting of profits and for damages resulting from an alleged unauthorized use of the patented invention in breach of a confidential disclosure made thereof by appellant to appellee.

A similar case filed in the District Court of Western New York against the Houde Engineering Company, owner of the Houdaille patents for shock absorbers and licensor of appellee's principal, Ford, a short time prior to the filing of the instant case, was tried first, and also decided against the appellant. Pennington Engineering Co. v.

Houde Engineering Corporation, 43 F.Supp. 698; 2 Cir., 136 F.2d 210, certiorari denied, 320 U.S. 771, 64 S.Ct. 84, 88 L.Ed. 461. The record in this case was introduced in evidence herein.

The controversy relates to hydraulic shock absorbers of the vane or piston type, used in automobiles to lessen the shock resulting from the rebound of the compressed springs which support the body of the car and soften the initial shock as the wheel strikes an obstruction or unevenness in the road. The shock absorber opposes resistance to the rebound action of the springs, and thus retards and diminishes it. In hydraulic shock absorbers, which now have displaced the old mechanical type such as the Hartford friction discs and the Gabriel snubber, motion is resisted by forcing a liquid such as oil or glycerine at high pressures through suitably restricted passages. The resulting friction converts the mechanical energy of the spring into heat, and the energy of the shock is dissipated in this form. Pressures of from 2,000 to 3,000 pounds per square inch are created in the operation, and the shock absorbers should therefore be stout, rigid and accurately aligned to obviate distortion and misalignment which cause binding and wear of the various parts. The leakage of the fluid creates a serious problem, for the amount of leakage through clearance varies as the cube. This means that if a clearance of one-thousandth of an inch is indicated, but the structure develops two-thousandths of an inch clearance, there will be about eight times instead of double the leakage contemplated. These circumstances necessitate an exceedingly close fit and precise alignment of all the parts.

Three types of construction are shown in the Pennington drawings, each of them disclosing a single-vane piston eccentrically mounted. Sheet one of the drawing which is principally used in illustration by appellant, discloses a three-part casing structure comprising end-plates and an intermediate casing all of circular form, and having flat faces placed in abutting relation to each other. The intermediate casing has an approximately sector shape opening running through it, which is closed by the end-plates, forming the high-pressure working cham-

ber of the shock absorber. The working chamber discloses abutments integral with the peripheral wall. A reservoir is provided to replenish the working liquid, and also to catch leakage through the two joints between the three walls. A swinging single-vane piston operates within the working chamber, as the specification discloses, connected rigidly and preferably integrally with a shaft which is eccentrically positioned in the end-plates. As the piston moves downward, there is a gradually increased "throttling" of the liquid, and this resistance dissipates the energy of the shock.

Appellee's accused structures, in contrast to appellant's device, are all double-vane concentric type hydraulic shock absorbers. The typical example is enclosed in a cup-shaped casing which defines the peripheral outer wall and one end wall of the working chamber. A removable end-plate is secured in the open end of the cup-shaped casing by threads formed in the cup. A reservoir supplies fluid and receives leakage, there being only one joint from which fluid may leak out, as distinguished from two joints in the Pennington device. The working chamber is divided into two equal parts by partitions, and the manner of securing these partitions is the important difference between appellee's accused structures and the prior art Houdaille shock absorbers. This type of construction is called the "ring-wing" type, because whereas formerly the partitions were positioned in the working chamber by a spanning member, in this type the partitions are constructed integral with a ring which is pressed into the wall of the working chamber. While Pennington's specification stressed the advantages of the three-part construction and the availability of broaching, it is the integrality of the abutment construction which has been repeatedly stated to be the principal feature of the conception and is now claimed to be the principal feature of infringement. Appellant contends that the integral partitions of the accused structures are the equivalent of Pennington's integral abutment.

The appellee supplies the Ford Motor Company with shock absorbers designed by Ford's licensor, the Houde Engineering Corporation, which is the holder of the various patents issued from 1909 on to Maurice

Houdaille, who was a pioneer in the hydraulic shock absorber field. Twenty-four million of the Houdaille type shock absorbers, made under various patents, had been produced at the time of trial, two million having been made by the appellee for Ford, its one customer, prior to this controversy. The Pennington shock absorber, while it had been exhibited to and approved by the engineering staffs of the Chrysler Company and the Lincoln Department of Ford, has never been sold or used commercially. Some one hundred and fifty of appellant's devices were produced for purposes of testing and exhibition, and it is testified by a competent expert that in actual road tests these shock absorbers gave excellent performance and were estimated to radically reduce costs.

Appellant here contends, as in the New York case, that the Pennington patent is valid and reads directly upon the accused devices. It asks for a definite ruling upon the validity of claim 37, the claim in suit. This question was passed over in the New York case and also by the master in this case. Appellee contends that the entire Pennington patent is invalid because of failure to disclaim, as required by § 4917 and § 4922, R.S., 35 U.S.C., § 65 and § 71; that claim 37 is invalid for want of patentable invention, and that appellee's devices do not infringe upon the ground, among others, that whatever Pennington disclosed which was used by appellee had been made available in the prior art, especially through Taylor, 1,438,507, and Sutton, 1,341,395.

The first contention arises from the fact that in the New York case counsel for appellant, who was relying upon claim 18 of the Pennington patent, withdrew it from the consideration of the court and stated in his brief that "Claim 18 seems to be met in at least one of the patents cited by defendant. * * * Accordingly plaintiff will not further press claim 18 in connection with this charge of patent infringement." Appellant's counsel further pointed out to the District Court in that case that he had conceded not non-infringement, but non-validity, and secured a corresponding change in the court's opinion. At the trial of the instant case counsel for appellant asserted that this was not a concession of invalidity, but constituted a mere explanation of the reason for withdrawing claim 18 from consideration. We think invalidity was squarely conceded, and that disclaimer under the statute should have followed without unreasonable neglect or delay, Marconi Wireless Telegraph Co. of America v. United States, 320 U.S. 1, 57, 63 S.Ct. 1393, 87 L.Ed. 1731, if claim 18 was a material or substantial part of the thing patented. Section 4922, R.S., 35 U.S.C., § 71. The failure to disclaim for four years after the concession of invalidity constitutes evidence of unreasonable neglect and delay. Appellee urges, therefore, that under the rulings in Ensten v. Simon, Ascher & Co., 282 U.S. 445, 51 S.Ct. 207, 75 L.Ed. 453, and Maytag Co. v. Hurley Co., 307 U.S. 243, 59 S.Ct. 857, 83 L.Ed. 1264, the entire patent must be held invalid.

This contention overlooks the fact that claim 18 is not a "material or substantial part" of the Pennington shock-absorber. Claim 18 revealed a check-valve construction, the function of which is to control communication between the working chamber and the reservoir, which appellant conceded had not been used extensively by the appellee. The specification showed an alternative form of check-valve construction. Claim 18 is the only claim which covers this specific means and the only advantage of its disclosure, as asserted by appellant's expert, is that it affects the cost of production. It embodies none of the principal features of the Pennington device, and has no real connection with this controversy. Under the statute, a disclaimer should have been made after the concession of non-validity; but failure to make it does not invalidate the entire patent. France Mfg. Co. v. Jefferson Electric Co., 6 Cir., 106 F.2d 605; Otis Elevator Co. v. Pacific Finance Corporation, 9 Cir., 68 F.2d 664, 667 (C.C.A. 9).

As to the questions of validity of the patent and non-infringement, the appellee is on surer ground. While the master made careful and elaborate findings and conclusions, he did not rule upon validity. We deem it our duty to consider this question. Sinclair & C. Co., Inc., v. Interchemical Corporation, 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644.

The only claim in suit is No. 37, which reads as follows:

"In a hydraulic shock absorber, the combination of a piston comprising a cylindrical hub and a vane extending therefrom; and a casing structure in which the piston is mounted comprising a part having a flat surface disposed transversely to the axis of the piston hub to engage one side of the piston vane, a second part having a flat surface correspondingly disposed to engage the other side of the piston vane, a third part disposed between said first and second parts and having flat lateral surfaces engaging the said flat surfaces of the two other casing parts and also having a curved surface arranged to engage the cylindrical surface of the piston hub and another curved surface arranged to engage the outer peripheral surface of the said vane, means for securing the three said casing parts together in fixed relation, and means forming a liquid reservoir space disposed to receive liquid leaking outward through the joints between the flat surfaces of the three said casing parts."

The patent contains no method claim, and no question of process is involved as to the infringement phase of the case. Claim 37 does not specify whether the shock absorber is to be of the single or double vane type; but the drawings relate to the single vane form, and the specification emphasizes the desirability of this construction. Moreover, Pennington testified that he prefers it. The specification calls for "arranging the piston shaft eccentrically in a circular casing structure" and stresses the fact that this secures "a high degree of compactness" and also results in an advantageous arrangement of the link which is used to join the end of the crank arm to the axle of the vehicle. Pennington continues: "This type of construction has very distinct additional advantage in a shock absorber designed to resist the pressure forces of a soft vehicle spring. That is to say, the single-vane form of construction is peculiarly adapted to furnish the very great resistance capacity necessary for such service since with it the necessary capacity can be secured with the casing structure smaller, more compact, lighter in weight and less costly than is possible where a multiple vane construction is used, be-cause the capacity of a vane type piston varies as the square of its mean effective radius and my studies have shown that because of this principle a distinctly higher degree of compactness can be obtained for high capacity shock absorbers by the use of a single vane piston." Doubtless because of such statements the master limited the scope of claim 37 to the single vane type; for the eccentric arrangement, as shown by the record, is not feasible for a double-vane type of piston, although it is possible to insert the double-vane type in the Pennington casing. We think that the master's ruling that Pennington covered the single-vane type was not error, although the usual blanket reservation is made that the invention is not limited to the particular forms of construction shown and described in the patent application. It clearly appears from the evidence that certain principal advantages regarded by Pennington as highly important would be forfeited if the double-vane construction was employed in Pennington's device. Moreover, the emphasis upon the single-vane type of construction, which is the construction shown in appellant's drawings and models, is significant in its bearing upon the question of infringement.

The accused structures have a concentric balanced construction in contrast to the unbalanced eccentric construction of the Pennington device. As found in effect by the Circuit Court of Appeals for the Second Circuit (Pennington Engineering Co. v. Houde Corporation, supra, 136 F.2d at page 215), in the eccentric construction there are side thrusts of the shaft upon which the vane is mounted which tend to destroy the alignment of the casing and the operating parts of the shock absorber. Pennington endeavored to solve problems presented by his eccentric positioning of the piston which problems are absent in the appellant's accused devices. The accused concentric balanced structure gets its alignment automatically from the machining of the parts and the form of the cup-shaped casing. The lock-pins used by the appellee are for the purpose of preventing a limited lateral movement or shifting, and not for securing alignment. Pennington built his device to meet the problems largely engendered by

his eccentric unbalanced form; but because the appellee did not employ this form it did not meet the same problems. The neutralization of the side-thrust which results from the use of the concentric structure was stressed by the appellee in its advertising in Automotive Industries as early as June, 1929. The automobile industry in general was not confronted by Pennington's problems at the time of trial, for the double-vane type had become the predominant type of shock absorber.

The gist of the invention, if any, was found by the District Court in the New York case to be "the new abutment integral with the peripheral wall in combination with old elements." 43 F.Supp. at page 703. The District Court quotes a statement from appellant's main brief in that case with regard to the abutment feature that "integrality is of the essence of the combinations" (43 F.Supp. at page 711), but the integral abutment is not claimed, and abutments are not mentioned in claim 37. It is in any case an age-old conception to secure rigidity and permanence by integral construction. The dowel pins, as pointed out in the opinion in the New York case, 2 Cir., 136 F.2d 210, are old. The reservoir and replenishment device, while adapted to the Pennington construction, is also old. The broaching of the intermediate part, stressed in the specification and at the trial, was old. The handbook "Machinery" in 1915 presented an extended description of the broaching process: Gabriel broached certain parts of shock absorbers in 1928. Appellant's expert stated that the prior art devices of both Taylor and Sutton were adapted to broaching. Every feature presented upon which appellant relies existed in the prior art and the integral abutment also had been disclosed there. Taylor, 1,438,507, discloses an abutment integral with the peripheral wall. Sutton, 1,341,395, has a two-vane concentric type shock absorber with the compartments separated from each other by web members which are an integral part of the construction, and a reservoir and replenishment device. Thayer, 1,883,436, discloses a shock absorber in many features closely responding to claim 37. These disclosures illustrate how crowded is the particular field of the art, and demonstrate that the conclusion of the Second Circuit was correct, Pennington Engineering Co. v. Houde Engineering Corporation, supra, that there is no invention in the abutment in view of Taylor and Sutton. The similarity of Taylor and Sutton in the abutment feature is conceded by appellant's expert, who testified in the New York case:

"The Court: The question here is * * * the nature of the abutment itself, and I mean whether the abutment of Taylor standing alone, of course, is comparable with Pennington.

"The Witness: Why I think I would say so. * * *

"The Court: * * * it could be broached out of one piece, the middle part of the three-part structure?

"The Witness: Yes, sir.

"The Court: It is made out the same as in Pennington?

"The Witness: Yes.

"The Court: And it has comparably the same shape inside? I am not speaking about the accuracy of the vane shaft or the accuracy of the bearing means, not that at all. What I am speaking about, the interior itself is comparable with defendant?

"The Witness: Yes, I would say so. * * * I would say the interior is comparable—I will go this far—to be perfectly frank with you, in Taylor or in Sutton, either one, we have got what you might call an outer working surface of the working chamber; we have got an inner surface, a cylindrical arcuate surface which mates with the hub of the vane; and we have got an abutment connection between them; and we have got a surface which can be broached out in either case."

Appellant contends that the Second Circuit Court of Appeals and the master in this case ignore the factor of "revolutionary" success enjoyed by Pennington and the fact that it filled a long-felt want. This record, however, does not reveal that Pennington achieved the results claimed. Appellant's expert conceded that Houdaille had excellent riding characteristics, that leakage was controlled, and replenishment of fluid was properly achieved; but he claimed that Houdaille did not secure rigid-

ity and that the cost was prohibitive. In contrast, he asserted that Pennington greatly reduced the cost of manufacture and secured complete rigidity and permanence. Yet in Pennington's specification he asserts that flexibility of clearance is a principal feature of his device; and since appellant's shock absorber never went into production, the comparative cost is not shown except by the estimate of a witness personally friendly to Pennington. Since Houdaille has a large trade in shock absorbers, including the low-cost cars made by Ford, it seems self-evident that the cost of Houdaille was really not prohibitive. Conceding that Pennington exhibits certain improvements, particularly in manufacturing method, and was approved by eminent engineering staffs, this record is barren of evidence that it revolutionized the industry. Chrysler, which had verbally agreed to purchase Pennington devices, if appellant could secure manufacture, never used them. The appellee and the Houde Corporation abandoned quantity manufacture of the accused "ring-wing" abutment structures about December 1938. Pennington neither went into commercial use nor materially affected the art, for it does not appear that the single-vane device emphatically recommended in his specification is used today except by Gabriel in replacement. We conclude that no patentable invention resides in claim 37.

If we are in error with reference to patentability of claim 37, we think that the decision of the District Court must be affirmed upon the ground that the accused devices clearly did not infringe. A comparison of appellee's shock absorbers with appellant's various models and charts, illustrative of Pennington and with models, charts and examples of the previous Houdaille shock absorbers shows that the accused structures followed and closely resembled the Houdaille 1922 prior art structures, under which Ford was licensed.

Both the Houdaille device and appellee's shock absorbers are of the double-vane balanced concentric type; both reveal an integral cup-shaped casing which constitutes the peripheral outer wall and one end wall; both have but one joint through which fluid may leak out into the working chamber and no leakage is possible at the closed end of the cup. Both use packing to prevent leakage along the end shaft, and employ the reservoir which supplies fluid to the working chamber and also receives leakage. Both have a removable end-plate secured by threads and partitions which divide the working chamber into two equal parts. Pennington has one working chamber of segmental shape, while the accused structures following Houdaille have two working chambers, each approximately semi-cylindrical. The principal difference between appellee's structure and the 1922 type Houdaille is the manner of positioning the partition or abutment; but the feature of the integral abutment, as demonstrated, was old in the art.

As to the cause of action based upon allegations of breach of confidence in the use by appellee of Pennington disclosures, the master's conclusion must also be affirmed. While the details and method of manufacturing appellant's shock absorber were given to appellee's officers in order to interest them in manufacturing the Pennington device, no obligation of secrecy was imposed. The same information was given to Ford, appellee's principal, and to numerous other manufacturers, under no promise of secrecy. The master found that the appellee did not use anything which was disclosed in confidence, and this finding is amply sustained by the record. The case of A. O. Smith Corporation v. Petroleum Iron Works Co., 6 Cir., 73 F.2d 531, relates to disclosure of trade secrets by a former employee of a corporation, in violation of his contract and in breach of confidence. It plainly has no bearing here.

The judgment of the District Court is affirmed.